THE STATE v. WALTER HUGHES, Appellant.—125 S. W. (2d) 66.

Division Two, February 21, 1939.

*Ralph P. Johnson, Herman Pufahl, Ben L. Clardy* and *Edgar J. Keating* for appellant.

118

*Roy McKittrick,* Attorney General, and *Arthur M. O'Keefe,* Assistant Attorney General, for respondent.

LEEDY, J.—Appellant was charged with murder in the first degree, in having stabbed and killed one Alvah J. Harris at the county of St. Clair. Tried in the circuit court of that county, he was found guilty of manslaughter and sentenced to a term of five years in the penitentiary, and he has appealed.

The sufficiency of the evidence to support the verdict has not been raised; nor, indeed, could a challenge thereof be sustained, if made. It is therefore unnecessary to set forth the evidence in any detail. The deceased, Alvah J. Harris, was about twenty-seven years of age at the time of his death. He had been married to Lois, the daughter of appellant, Walter Hughes. Their marriage had terminated in divorce, the decree going to the husband, and the custody of an infant son was divided equally between the parties, in alternating periods of two weeks each. Lois had remarried, but at the time in question was living at the home of her parents in the town of Collins. Harris, the deceased, lived across the street. It was his custom, during the periods when the child was in the care of its mother, to take a quart of milk daily to the home of appellant for the use of the child. It was in connection with such a delivery, at about 6 P. M., on January 19, 1937, which proved to be the final one, that the altercation in question arose, and out of which this prosecution grew.

The evidence on the part of the State tended to show that when Harris opened the door of the Hughes home, appellant ordered him out, and directed that he stay out, and ran at him with a knife; that Harris ran to the street, and was pursued by appellant who stabbed him several times with a knife. There were four cuts on his left side

along the mid-line, about four inches under the arm, and a long, lacerated, jagged wound on deceased's head. The largest of the cuts was about an inch and a quarter to an inch and a half in length. The other three stab wounds were smaller. Although it was shown that immediately after the encounter Harris was in a condition of severe shock, and was bleeding profusely, the hemorrhages were external only, and none of the cuts penetrated the pleural cavity, and their nature was not such as to necessarily prove fatal. However, an infection set up and Harris died on January 23, four days later, as a result of said wounds.

On the part of appellant, it was shown that he was a man sixty-three years of age and in somewhat delicate health; that there had been unpleasantness between himself and deceased growing out of the marital difficulties mentioned; that he had previously ordered deceased out of the house on several occasions; that on the night in question, when Harris came to the door, after telling the latter to take the milk and go home, and informing him that if the baby needed any medical aid or milk, he would see that he got it, deceased applied a vile epithet to appellant, and invited him to go outside, saying, "I am going to knock your brains out;" that appellant believing he had to fight, either in the house or outside, followed deceased outdoors; meanwhile the latter was cursing him. A lively altercation ensued out in the street in which appellant admitted that he got out his knife, and stabbed deceased, but contended that he acted in self-defense, and in the defense of his daughter whom Harris was menacing. Other pertinent facts will be stated in the course of the opinion in connection with the points to which they relate.

By contrasting the great variety of errors as alleged in the motion for a new trial with the points now relied on for a reversal, it will be seen that the appellate issues have been sharply reduced. As narrowed, they may be said to be limited to two general propositions, both bottomed on rulings of the trial court with respect to certain evidence admitted on the part of the State.

I. The first of appellant's complaints is that the several dying declarations of deceased, five in number, were improperly admitted in evidence over his objections and exceptions. It is the contention that there was no sufficient foundation laid for the introduction of any of the statements as dying declarations, in that it was not shown that they were made in anticipation of impending dissolution and at a time when the declarant had abandoned all hope of recovery. In view of the position taken by the State, it becomes unnecessary to relate even the substance of the several statements, or the circumstances attending their utterance, except, perhaps, as to the last (fifth) one, because the State tacitly concedes that the first four statements were not made while the declarant was *in extremis,* or under such

circumstances to render them admissible in the first instance. In that connection respondent's brief states: "We base the validity of the first four declarations upon the fifth declaration which was made by the deceased to his mother the day before he died. . . . The statement made to Mrs. Harris (the mother) was a reiteration and recapitulation of the four previous dying declarations. Therefore, even if the admission of the four previous declarations was error, such error was cured when the dying declaration made to Mrs. Harris was put in evidence."

The fifth declaration was in a conversation between Harris and his mother on Friday, the day before his death. He was in his room at the Dimmitt Memorial Hospital at Humansville, to which institution he had been taken the night of the altercation. It was not shown that he had been advised by his physicians either that death was imminent, or that he could not expect to recover; however, it does appear that a "strep" infection of the tissues had developed from the stab wounds (proved as the cause of death), which was apparent as early as 9 o'clock the morning after the fight, and deceased's knowledge thereof. The mother, who had been with her son throughout the entire time he was in the hospital, testified that on Friday morning, "He talked about these wounds . . . and showed them to me and complained about them hurting him so bad;" that she went out to lunch, and came back in, and that the doctors had been in to see him while she was gone; that "when I went up and took my coat off and hat, he just laid his hand out that way (indicating) and said, 'Mother, look here.' says, 'See that poison? You know what that means;' he says, 'I hope you get the baby.' " Previously, he had manifested despair of recovery, as attested by his statement to Cleve Wilson, his employer (to whose place of business he went directly after the fight) when and where, after asking for a place to lie down, and requesting that a doctor be called, he said: "I believe I am going to die." Within a short time thereafter, the prosecuting attorney arrived and reduced to writing what purported to be a dying declaration. It is true that there was testimony to the effect that in the interim between the night on which he was cut and the day of his death, Harris had indicated a belief on his part that he would be sufficiently recovered as to leave the hospital in a few days.

In State v. Livingston (Mo.), 204 S. W. 262, where one of the questions was whether a declaration was made under the sense of impending death and wherein no physician or other person had told declarant that there was no hope for him, the following from Mattox v. United States, 146 U. S. 140, 13 Sup. Ct. 50, 36 L. Ed. 917, was quoted: "This (whether made under the sense of impending death) may be made to appear from what the injured person said; or from the nature and extent of the wounds inflicted, being obviously such that he must have felt or known that he could not survive, as well as from his con-

duct at the time and the communications, if any, made to him by his medical advisers, if assented to or understandingly acquiesced in by him. The length of time elapsing between the making of the declaration and the death is one of the elements to be considered, although as stated by Mr. Greenleaf, 'It is the impression of almost immediate dissolution, and not the rapid succession of death, in point of fact, that renders the testimony admissible.' '' To the same effect is the comparatively recent case of State v. Flinn (Mo.), 96 S. W. (2d) 506.

In the Livingston case there was quoted with approval from State v. Nocton, 121 Mo. 537, 26 S. W. 551, the following from 1 Greenleaf on Evidence (14 Ed.), section 158: '' 'It is essential to the admissibility of these declarations, and is a preliminary fact to be proved by the party offering them in evidence, that they were made under a sense of impending death; but it is not necessary that they should be stated, at the time, to be so made. It is enough, if it satisfactorily appears, in any mode, that they were made under that sanction, whether it be directly proved by the express language of the declarant, or be inferred from his evident danger, or the opinions of the medical or other attendants stated to him, or from his conduct, or other circumstances of the case, all of which are resorted to in order to ascertain the state of the declarant's mind.' '' [See, also, State v. Evans, 124 Mo. 397, 28 S. W. 8.]

In State v. Custer, 336 Mo. 514, 80 S. W. (2d) 176, where the evidence showed that at the time decedent made a statement as to how the shooting occurred he had remarked, ''He got me; I am all in,'' that he was suffering severely, dying fourteen hours later, the statement was held admissible.

In the light of these authorities, we think it sufficiently appeared that the statement was made under such a sense of impending death as to warrant the court in admitting it in evidence.

The rule invoked by the State as to the four other declarations is, in fact, broader than that contended for. Its operation is not limited to a purely curative effect, but under it prior declarations which were inadmissible at their first utterance (because not made under the prescribed sanctions) are rendered admissible. Thus we find in State v. Evans, supra, this court said: ''Where prior declarations are inadmissible at their first utterance, they may become admissible when subsequently the declarant becomes conscious that he is dying, and reaffirms his former statements.'' [See, also, to the same effect, State v. Garth, 164 Mo. 553, 65 S. W. 275; State v. Thomas (Mo.), 180 S. W. 886.]

It is not contended that the fifth declaration offended against the rule restricting the subject matter of dying declarations ''to the identification of the accused and the deceased, and to the act of killing, and the circumstances immediately attending said act, and forming a part of the res gestae.'' [State v. Strawther, 342 Mo. 618, 116 S.

W. (2d) 133; State v. Parker, 172 Mo. 191, 72 S. W. 650; State v. Wilks, 278 Mo. 481, 213 S. W. 118; State v. Peak, 292 Mo. 249, 237 S. W. 466; State v. Flinn, supra; State v. Matthews, 341 Mo. 1121, 111 S. W. (2d) 62.] So that all that remains is to determine whether the declaration held admissible was reiteration or reaffirmation of the former statements, or, as the Thomas case puts it, "varying in no essential feature." If it be the fact, then such former declarations, under the cases just cited, were admissible, and the court fell into no error in receiving them. But a comparison of the several declarations shows that, at least as to one of them, there were features embodied and recitals not mentioned or referred to in the one detailed by the mother. More specifically, the declaration testified to by Cleve Wilson was, in part, as follows: "He (deceased) laid the knife on the counter and said, 'Cleve, take care of this knife, *that is the knife he stabbed me with,* and don't let Hughes or any of his family have this knife.'" As stated, nothing of this character was mentioned in the last, or fifth declaration, and the departure being one of substance, and, therefore, at variance with the admissible declaration, we are forced to deny the applicability of the rule invoked by the State. Furthermore, in view of the result presently to be reached, we take occasion to say that the portion of the declaration last above quoted, except that which is italicized, should not be received upon another trial, because not within the scope of subject matter of dying declarations, as outlined by the authorities hereinabove set forth. The italicized phrase, which identifies the knife as the one with which appellant stabbed deceased, is admissible as the statement of a circumstance constituting the *res gestae* of the homicide, and may be received, provided its admissibility is otherwise determined upon a showing touching the declarant's state of mind at the time of the making thereof.

II. The other and remaining point is likewise concerning a question of evidence; that is, we are to determine whether or not the decree of divorce in the suit between deceased and the daughter of appellant, as well as a motion by Harris to modify the same with respect to the custody of the child, filed shortly before the homicide, both of which are introduced as a part of the State's case, were incompetent, and if so, was their admission to the substantial prejudice of appellant. The State's position is that they were admissible for the purpose of showing motive. The appellant vehemently complains that because this is not a case wherein the State relies on circumstantial evidence, but on the contrary, appellant admits the killing and attempts to justify it as in self-defense, and as he was not a party to the suit, the decree in which had been rendered more than six months before the homicide, the documents in question bore no relevancy to any issue; and because of the nature of their recitals and allegations,

their effect was necessarily prejudicial, in that they exalted the deceased in the minds of the jury, and debased the daughter of the accused, and through her, the accused.

In 1 Wigmore on Evidence (2 Ed.), section 118 (4), page 358, it is stated: "Where the doing of the *act is conceded,* and the dispute turns on an issue such as self-defense, there is in strictness no materiality for evidence which tends merely to prove the doing of the act, and, in particular, there is no evidential function remaining for the fact of emotion or motive." However, the author points out the reasons why it does not necessarily follow that in criminal cases all such evidence should be excluded, and that "in some of its loose popular senses, 'motive' is frequently in issue, and these uses must be distinguished from the evidentiary use of emotion or 'motive' as tending to prove the doing of an act. . . . 'Motive.' may be in issue, in the sense of *malice* or *criminal intent.*" Motive is not an essential element of the offense, but in cases of circumstantial evidence becomes important. Thus we find in State v. Wheaton (Mo.), 221 S. W. 26, "While not material where the commission of the crime by the accused has been clearly shown, where the evidence is wholly circumstantial, to fully establish what we have defined as the second element of the crime (that the crime was committed by the accused) proof of motive becomes material as explanatory of the killing and as tending to show the connection of the accused with the crime or the inducement, which led him to commit it." [Citing State v. Bass, 251 Mo. 107, 157 S. W. 782; State v. Concelia, 250 Mo. 411, 157 S. W. 778, relied on by appellant in the case at bar.]

In State v. Brown, 181 Mo. 192, 79 S. W. 1111, defendant had requested an instruction upon the subject of motive where, as here, the act was admitted. In upholding the ruling refusing such an instruction, this court, in an opinion by Fox, J., said: "Upon the undisputed facts of this case, . . . the action of the court . . . was clearly right. . . . In this case, there is no doubt surrounding the perpetration of this crime or the manner in which the killing was done, and the defendant testifying in his own behalf, furnishes the only reason and motive for the commission of the act; that was, that the deceased applied to him the epithet that he was a 'drunken son-of-a-bitch.' In cases where the killing is denied, and the proof of that fact depends upon circumstances, or where the defense is made that the killing was purely an accident, it is apparent that the inquiry as to motive is important. . . ."

State v. Santino (Mo.), 186 S. W. 976, points out the distinctive meaning of the words "motive" and "intent," the court there saying: "Motive and intent are in no sense synonymous. They mean two different things. . . . Motive is the moving cause which induces action; it has to do wholly with desire. Intent is the purpose or design with which an act is done, and involves the will. [Com. v.

Raymond, 97 Mass. 567.] Motive is not an essential ingredient of crime; intent is always so, whether the offense be of common-law or statutory origin.''

Distinguishing, then, between motive, as the state of feeling impelling towards an act, and intent, as the mental state accompanying an act (Wigmore, supra, sec. 306, p. 621), it is manifest that the latter was a fact at issue in the case, so that, if the documents in question evinced a material fact or circumstance throwing light on the homicide, they were relevant and admissible.

Appellant relies, among other authorities, upon State v. Kuehner, 93 Mo. 193, 6 S. W. 118. In that case a conviction of murder in the first degree was reversed and the cause remanded for the sole reason that a petition for divorce, filed by the wife (deceased) against her husband, the defendant, was allowed to be read to the jury. The petition was admitted on the theory that, because it had been read to the defendant by the officer at the time the writ of summons was served, it was proper to read it to the jury for the sole purpose of showing the whole of the conversation between the officer and defendant at the time referred to. The jury was instructed that it was for this limited purpose, and further, that the allegations and statements therein were ''not evidence of their truth and must not be considered by the jury as evidence proving, or tending to prove the truth'' thereof. The court observed the petition contained charges of a damaging and prejudicial character, and in disposing of the point said, ''While counsel for the State admits in his brief that the evidence was irrelevant, it is nevertheless insisted that the restriction put upon its consideration by the jury cured the error in receiving it, and that defendant was not prejudiced. When the charges made in the petition of the character hereinbefore stated are considered, its introduction as evidence was certainly prejudicial to defendant.''

In 1 Wharton's Criminal Evidence (11 Ed.), section 226, page 269, in treating of the exclusion of irrelevant evidence it is stated: ''While it is stated generally that the rules of law with regard to the admission of evidence are to be applied in civil and criminal cases alike, yet in criminal cases, the necessity always exists for a rigid enforcement of the rule that evidence that does not tend to prove or disprove the charge must be excluded. The admission of irrelevant facts which have a prejudicial tendency is fatal to a judgment.

''The importance of the rule is apparent when it is considered that irrelevant evidence so frequently vitiates a verdict. The courts uniformly hold that where irrelevant evidence is admitted that is prejudicial, the verdict of the jury must have been based upon such irrelevant evidence, as well as upon evidence properly admitted as relevant, and while there might be sufficient of such relevant evidence to sustain a verdict, nevertheless it must be set aside.''

Binns v. The State, 57 Ind. 46 (thrice reversed), is a leading

case. The charge was murder of appellant's wife, wherein the State gave in evidence parts of the record of an action for divorce by the deceased against appellant. The complaint or bill was omitted, but the orders of the court for the payment of money by defendant, restraining the transfer of property, the appointment of a receiver, etc., were given in evidence. In holding such to constitute error, the court said:. "We are of opinion that the parts of the record given in evidence were irrelevant and incompetent. The orders of the court in that suit could have had no bearing upon the alleged murder. We do not see how they could legitimately have shown a motive for the commission of the murder. It may have been competent to show the state of feeling between the parties, and for this purpose it may have been competent to show that a lawsuit was pending between them. [State v. Zellers, 2 Halst. 220; Monroe v. The State, 5 Ga. 85.] But the mere fact of the pendency of the suit might have been proved by parol. [Stanley v. Sutherland, 54 Ind. 339-353.]

"The contents of the record given in evidence could have served no legitimate purpose in the prosecution, but may have injured the defendant, and we think the court erred in admitting them."

The Kuehner case, supra, is the only Missouri case on the point to which our attention has been called; however, the adjudicated cases in other jurisdictions point clearly to the fact that the weight of authority is that in cases where the defendant is a party to the proceedings, it is admissible to prove the fact of the pendency thereof, but not the details—usually as tending to show the state of feelings existing between the defendant and the deceased at and prior to the time of the homicide. [People v. Holloway (Cal.), 151 Pac. 975; People v. McNeer (Cal.), 57 Pac. (2d) 1018; Frazier v. Commonwealth (Ky.), 207 S. W. 13; Pinckord v. State, 13 Tex. App. 468; Powdrill v. State (Tex.), 138 S. W. 114; Spivey and Lynch v. State, 114 Ark. 267; 1 Michie on Homicide, sec. 165, 2bb, p. 705; 30 C. J., sec. 408, p. 184. Analogies—State v. Reavis, 71 Mo. 419; People v. Lavac (Ill.), 192 N. E. 568. Contra: Vaughn v. State (Ala.), 144 So. 458; Curtis v. State (Ga.), 110 S. E. 907.]

We agree with the contention of appellant that the grounds of the divorce, as stated in the decree, and the allegations of the motion to modify, which were mere ex parte statements, were such as to exalt deceased in the minds of the jury and debase the daughter of the accused, and through her, the appellant. Proof of the particulars not being admissible against appellant for the purpose stated, it follows that the court erred in permitting the documents to go to the jury; and whether or not calculated to prejudice the jury against appellant, we think such was their necessary effect. On another trial, the evidence as to this phase of the case should be limited to the fact of divorce and the pendency of the motion to modify.

For the errors noted, the judgment is reversed, and the cause remanded. All concur.